# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>ERIC ZUTRAU,<br><br>        Debtor<br>_____<br>LEILANI ZUTRAU,<br><br>      Plaintiff<br><br>v.<br><br>ERIC ZUTRAU,<br><br>      Defendant | Chapter 7<br>Case No. 11-11815-FJB<br><br><br><br>Adversary Proceeding<br>No. 11-1183 |

### MEMORANDUM OF DECISION

I.      **Overview**

By her amended complaint in this adversary proceeding, Leilani Zutrau, sister of the debtor and defendant Eric Zutrau, seeks a determination that debts owed by Eric to Leilani totaling $374,893.68 plus interest are excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as debt arising from fraud or misrepresentation.  Additionally, Leilani seeks a determination that debt owed for the misappropriation of the proceeds of a sale of real property in which Leilani allegedly held an interest, totaling at least $151,000, is excepted from discharge under 11 U.S.C. § 523(a)(6) as debt for willful and malicious injury. Leilani has also sought additional relief under 11 U.S.C. § 727, which, as explained below, has been previously denied by this Court.   After a trial, the Court now makes the following findings and rulings and on the basis thereof, concludes that debts owed to Leilani in the amount of $193,000, plus all applicable interest thereon, are excepted from discharge under 11 U.S.C. § 523(a)(2)(A), and that, of this amount, $80,000, plus all applicable interest thereon, is excepted from discharge on a separate basis

under 11 U.S.C. § 523(a)(6).  The Court further concludes that the balance of the debt owing beyond the

$193,000, plus all applicable interest thereon, as further detailed below, is *not* excepted from discharge.

## II.      Procedural History

On March 3, 2011, Eric filed a petition for relief under chapter 7 of the Bankruptcy Code.  The

first date set for the meeting of creditors was April 5, 2011, and accordingly the deadline for filing

complaints to object to discharge or to determine the dischargeability of a debt was June 6, 2011.  On

that day, Leilani, acting pro se, filed the complaint commencing this adversary proceeding.  The original

complaint sought a determination of nondischargeability under § 523(a)(2)(A) and (a)(6).  It did not

purport to constitute an objection to discharge, did not request a denial of discharge, and made no

reference to § 727.  No objection to discharge under § 727 having been filed by the June 6, 2011

deadline for doing so, the Court entered a discharge in favor of Eric on August 16, 2011.

Eric filed an answer on June 22, 2011.  Thirteen days later, on July 5, 2011, Leilani filed an

amended complaint ("Amended Complaint") in which, for the first time, she purported to object to Eric's

discharge under § 727(a)(2), (3), and (4).  The Amended Complaint included new allegations of fact but

failed to specify which of the alleged facts constituted the factual basis for each objection to discharge.

On July 19, 2011, Eric filed a Rule 12(b)(6) motion to dismiss the complaint for failure to state a

basis for excepting the debt from discharge under § 523(a)(2)(A) or (a)(6).

On February 29, 2012, Leilani filed a second amended complaint ("Second Amended

Complaint") and a motion for leave to file the same.  The stated purpose of the Second Amended

Complaint was to cite facts and information in support of Leilani's objection to discharge under §

727(a)(2), (3), and (4).  Eric opposed the motion to amend, arguing that any objection to his discharge

was untimely and therefore that the proposed amendment would be futile.

On November 13, 2012, this Court entered orders granting in part and denying in part Eric's

motion to dismiss and granting in part and denying in part Leilani's motion to amend.  The Court

deemed the Second Amended Complaint amended to allege additional facts as follows:

a.  When Leilani lent Eric money and Eric gave her promissory notes evidencing the resulting
indebtedness, Eric made promises, memorialized in each of four promissory notes he gave
her (Notes B through E), that he would execute mortgages on the Brookline Property to
secure his obligations to her, but he did not execute any such mortgage, or (if he executed
them) at least did not record mortgages that he did execute.  His promise to give her
mortgages and record them was a false statement of intent.

b.  Eric knowingly made a false representation that Leilani relied on when, in an email of
September 11, 2006, he assured her that she would be repaid upon sale of the Brookline
Properties and immediately after certain bank mortgages on those properties were
satisfied; the assurance was false because Eric made it without intent to honor it.

The Court then denied Eric's motion to dismiss as to the counts under § 523(a)(2)(A) that are

articulated by virtue of the amendments set forth in the above paragraphs and as to the count under §

523(a)(6) for Eric's failure to pay Leilani the proceeds he received from the sale of real property, in which

Leilani allegedly held an interest, after all senior encumbrances were satisfied.  The Court granted the

motion to dismiss as to all other counts that Leilani had articulated.

The Court then granted Leilani's motion to amend for the purpose of adding a count for

revocation of discharge under § 727(d).  The Court denied, as untimely, Leilani's motion to amend for

the purpose of adding an objection to discharge under § 727(a).

On December 2, 2012, Eric filed an answer to the Second Amended Complaint.  On December

20, 2012, Eric filed a limited motion to dismiss Leilani's count for revocation of Eric's discharge for failure

to plead any cause for revocation of Eric's discharge.  The Court held a hearing on the motion to dismiss,

during which, Leilani, now represented by counsel, opposed the motion.  The Court denied the motion

to dismiss on March 14, 2013.

On January 26, 2014, Eric filed a motion for summary judgment as to all remaining counts.

On March 10, 2014, the parties file a joint pre-trial memorandum.

3

On April 2, 2014, the Court granted Eric's motion for summary judgment as to the count for revocation of discharge under § 727(d) and denied the motion as to the dischargeability counts under § 523(a)(2)(A) and (a)(6).

On April 16, 2014, Leilani filed a motion to reconsider the order granting Eric's summary judgment motion as to the revocation of discharge count.  On April 23, 2014, Leilani filed a motion for leave to file a third amended complaint in order to cite additional allegations and facts in support of her claim for revocation of discharge.  On August 28, 2014, the Court denied the motion to reconsider the partial summary judgment order.  On the same date, the Court denied the motion for leave to file a third amended complaint finding that justice required denial of the motion and noting that Leilani had been afforded "ample opportunity to 'get it right' in the first three complaints and, at the latest, within a reasonable time after counsel first appeared for her."  In denying the motion to again amend the complaint, the Court noted that discovery had been closed for several months and the case was only weeks away from trial.  Accordingly, what remains for adjudication in this adversary proceeding are the dischargeability counts under § 523(a)(2)(A) and (a)(6)

On September 8, 2014, the parties filed an additional joint pre-trial memorandum.  The parties tried the matter over five days.  At the close of her case in chief, Leilani moved, through counsel, that the Court "conform the complaint to the body of the evidence as was presented in [her] case in chief," arguing that the evidence may have adduced statements that qualify as misrepresentations under 11 U.S.C. § 523(a)(2)(A) that were not plead in either the original or amended complaints.  The Court denied this motion.  Eric then moved, through counsel, for a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c), as made applicable by Fed. R. Bankr. P. 7052.  The Court also denied this motion.

After the trial, the parties submitted proposed findings and conclusions.  The parties also submitted a stipulation identifying the exhibits the Court should consider in ruling on this matter.  The Court held closing arguments, after which time, the Court took the matter under advisement.

III.     **Findings of Fact**

**Eric and Leilani**

1.      Eric and Leilani are brother and sister.  At all relevant times, Eric has resided in

Massachusetts and Leilani has resided in New York.  Eric is a self-employed contractor.  Leilani is

currently self-employed doing "accounting work," but until June 2007, she was employed as an

executive at a financial services firm, and she had a steady income.

**The Oak Bluffs Property**

2.      In or around 2002, Eric and Leilani agreed to use their combined resources and abilities

to build a single-family house at 14 Prospect Avenue, Oak Bluffs, Massachusetts (the "Oak Bluffs

Property").  The house at the Oak Bluffs Property was not completed until 2010.

3.      The Oak Bluffs Property had been conveyed to Eric by his mother.  Eric subsequently

conveyed fifty percent of his interest in the Oak Bluffs Property to Leilani, as the two became tenants in

common, each with a fifty percent ownership interest.  In exchange for this conveyance, Leilani agreed

to contribute funds toward the construction project.  The parties agreed that after Leilani had

contributed sufficient funds as consideration for her fifty percent interest, Eric and Leilani would evenly

split the expenses of the construction project.

4.      In or around 2002, the parties obtained a $200,000 construction loan, and building

began with Eric supervising the construction of the house on the Oak Bluffs Property.

**The Brookline Property**

5.      In 2006, Eric identified a property at 74 Chestnut Street in Brookline, Massachusetts (the

"Brookline Property") that he believed would be a profitable condominium conversion venture.  Eric

approached Leilani for funding.  At this time, the project at the Oak Bluffs Property was still ongoing.

6.      In March 2006, Leilani provided Eric with $123,000 to be used as a down payment to

purchase the Brookline Property.  Leilani borrowed the $123,000 from a line of credit with Chase Bank

that was secured by her personal residence in New York.[1]  Leilani was the sole obligor on this line of credit with Chase Bank.

7.      Eric executed a promissory note to Leilani for the $123,000 on March 24, 2006 in which he agreed to repay Leilani the $123,000 and interest at a yearly rate of 7% on or before September 24, 2006.[2]  The note contains a security clause which says that the principal and interest owed under the note shall be secured by Eric's share of ownership in the Oak Bluffs Property.

8.      Using the $123,000 from Leilani as a down payment, Eric purchased the Brookline Property in April 2006 for $825,000.  Eric financed the balance of the purchase price by borrowing additional funds from Taylor, Bean & Whitaker Mortgage Corp. and National City Bank.  Eric borrowed $618,750 from Taylor, Bean & Whitaker Mortgage Corp. secured by a first position mortgage on the Brookline Property, and he borrowed $122,901.00 from National City Bank secured by a second position mortgage on the Brookline Property.  The total amount of money Eric borrowed, including the $123,000 from Leilani, was $864,000.  The additional funds over the purchase price were to be used toward converting the Brookline Property into condominiums.

9.      Eric eventually converted the Brookline Property into three condominium units after borrowing additional funds from Leilani as detailed below.

**The Citibank Line of Credit**

10.     In late March 2006, with Eric's consent, Leilani obtained a $400,000 line of credit from Citibank secured by the Oak Bluffs Property, but on which Leilani was the sole obligor.  The parties had initially intended to apply for this line of credit together, but Eric's poor credit score dissuaded the parties from adding Eric's name to the application.

---

[1] Eric testified that the $123,000 came from Leilani's wrongful conversion of an insurance check. Trial Tr. vol 4, 60:7-22, September 16, 2014.  I do not find Eric credible on this point.  I credit Leilani's testimony as to the source of the funds, and accordingly, I make the above finding of fact on that basis.

[2] No allegations of non-dischargeability have made with respect to the creation of this initial debt.

11.      In April 2006, with Eric's consent, Leilani used $123,000 drawn from the Citibank credit line to completely pay off the funds she had borrowed from the Chase Bank credit line that was secured by her home, in effect, transferring this debt from the Chase Bank credit line to the Citibank credit line. Additional funds were drawn from the Citibank line of credit to fund the still ongoing Oak Bluffs Property construction and to pay for a portion of Eric's personal expenses.  The parties agreed to equally share the cost of the interest payments on the Citibank line of credit.

**Note A**

12.      By September 2006, Leilani had contributed sufficient funds toward the Oak Bluffs Property to have paid funds well in excess of the amount needed to pay for her fifty percent interest.  At this time, Eric acknowledged that in addition to owing Leilani the $123,000 he borrowed for the Brookline Property purchase, he owed Leilani $77,000 for his share of the expenses at the Oak Bluffs Property.

13.      In September 2006, rather than repaying the $123,000 plus interest as he had agreed, Eric asked Leilani to borrow an additional $100,000, which he needed in order to continue the conversion of the Brookline Property into condominiums.  Additionally, Eric asked Leilani to "cover" his portion of the interest payments owed on the Citibank line of credit for the duration of the loan.  Eric promised to repay the full amount he owed Leilani from the sale of the Brookline Property right after he paid off the bank mortgages.  In an e-mail dated September 11, 2006, Eric stated, "When I sell the [Brookline Property], which I aim to do this fall, you will be right behind the bank, before anyone private I owe."

14.      On or around September 22, 2006, relying on Eric's representation that he would pay her back in full from the sale of the Brookline Property after he paid off the banks, Leilani loaned Eric the additional $100,000 using funds she borrowed from the credit line on the Oak Bluffs Property.  Leilani also agreed to temporarily "cover" $13,000 of Eric's portion of the upcoming interest payments on the

7

Citibank line of credit. On September 22, 2006, Eric executed a promissory note ("Note A") in which he agreed to repay Leilani a total of $241,000 on or before April 22, 2007. The $241,000 included the original $123,000 loaned in March 2006, the newly extended $100,000, $13,000 for Eric's share of interest payments on the Citibank line of credit, and $5,000 Eric owed Leilani from a separate transaction.[3] Note A contained a security clause which provided that "until the principal and interest owed under this promissory note are paid in full, this note will be secured by the mortgage covering [the Oak Bluffs Property]." Note A does not contain a provision for the payment of interest.

15.     On or about September 22, 2006, pursuant to the terms of Note A, Eric recorded a mortgage that he had executed in favor of Leilani on the Oak Bluffs Property in the amount of $241,000 at the Registry of Deeds in Dukes County, Massachusetts.

**Note B**

16.     In December 2006, Eric approached Leilani about borrowing an additional $30,000 to continue developing the Brookline Property. On or around December 18, 2006, Eric executed a promissory note ("Note B") in which he agreed to repay Leilani $30,000 plus interest at a yearly rate of 7.75% on or before February 18, 2007. Note B contained a security clause which provided that "until the principal and interest owed under this promissory note are paid in full, this note will be secured by a mortgage covering the [Brookline Property]." Eric orally promised Leilani that he would execute and record a separate mortgage document granting Leilani an interest in the Brookline Property to secure the debt embodied by Note B. Leilani, who lived in New York and traveled extensively, trusted Eric, who lived in Massachusetts, to both execute and record the mortgage securing Note B.

17.     Leilani loaned Eric the $30,000 identified in Note B in December 2006. In making this loan, Leilani relied on Eric's representation that he intended to execute and record a mortgage securing this debt. Leilani also relied on the representations contained within Note B. Additionally, Leilani

---

[3] No evidence has been offered by either party as the details of the $5,000 "separate transaction."

continued to rely on Eric's September 2006 promise that he would pay Leilani in full from the proceeds

of the sale of the Brookline Property after he had paid off the existing debts owed to the banks.

18.    Eric did not read the contents of Note B before signing it.  When asked at trial about the

series of notes he eventually executed, Eric testified:

> A.    I can tell you right now I honestly didn't even read
> the notes and that's –
>
> Q.    Oh.
>
> A.    -- bad on my part and that's not an excuse. I --
>
> Q.    Well, you borrowed $600,000 in all from another individual, not from a
> bank despite what you may have called her, and it's your testimony you
> did not read the notes?
>
> A.    I didn't even read them, no.
>
> Q.    Wow. Okay. But you signed them?
>
> A.    Absolutely.[4]

19.    Eric did not execute a separate mortgage document securing Note B.  No mortgage was

ever recorded on the Brookline Property securing Note B.

**Note C**

20.    In January 2007, Eric again informed Leilani that he needed additional funds to complete

the renovation of the Brookline Property.  He asked Leilani to loan him an additional $30,000.  On or

around January 9, 2007, Eric executed a promissory note ["Note C"] in which he promised to repay

Leilani $30,000 plus interest at a yearly rate of 7.75% on or before February 18, 2007.  Note C contained

a security clause with identical language to that of Note B stating that Note C would be secured by a

mortgage covering the Brookline Property.  Along with Note C, Eric executed a separate mortgage

---

[4] Trial Tr. vol. 4, 13:18 – 14:2, Sep. 16, 2014.

document granting Leilani an interest in the Brookline Property to secure the debt embodied by Note C. Eric orally promised to record this mortgage at the registry of deeds.

21.     Leilani loaned Eric the $30,000 identified in Note C in January 2007.  In making this loan, Leilani relied on Eric's representation that he intended to record the mortgage he had executed securing this debt.  Leilani also relied on the representations contained within Note C.  Additionally, Leilani continued to rely on Eric's September 2006 promise that he would pay Leilani in full from the proceeds of the sale of the Brookline Property after he had paid off the existing debts owed to the banks.

22.     Eric did not read the contents of Note C before signing it.

23.     Despite the facts that Eric executed a mortgage securing Note C and that Eric orally promised to record the mortgage at the registry of deeds, no mortgage was ever recorded on the Brookline Property securing Note C.

### Without Leilani's Knowledge, Eric Refinances the Second Mortgage on the Brookline Property

24.     As stated above, Eric had previously granted a $618,750 first mortgage on the Brookline Property to Taylor, Bean & Whittaker Mortgage Corp. and a $122,901 second mortgage on the Brookline Property to National City Bank.  On or around February 14, 2007, Eric granted an additional mortgage to National City Bank on the Brookline Property in the amount of $250,000.  This new mortgage loan took out the existing second mortgage loan held by National City Bank.  A discharge of the original second mortgage loan was executed on February 26, 2007 and recorded on March 7, 2007.

25.     The $250,000 mortgage was subsequently recorded at the registry of deeds.  Eric did not tell Leilani about this mortgage.

### Eric Repays Note B

26.     On or around February 21, 2007, Eric paid Leilani $10,000 toward the $30,000 principal owed on Note B.  In March 2007, Eric paid Leilani the remaining $20,000 principal owed on Note B.

**Note D**

27.     In April 2007, Eric again approached Leilani for additional funds for the Brookline

Property renovation.  Again, he asked for a loan of $30,000.  By this time, Note C was overdue.

However, Eric assured Leilani "that he would protect [her] interests and that he was actively trying to

finish the project and sell the [Brookline Property] as soon as he could and that it was going to happen

quickly and, therefore, [Leilani] shouldn't worry, that he would repay [her] everything."[5]  Leilani took

assurance in the fact that Eric had paid off Note B.  She also took assurance in her belief that Eric had

done as he had promised and recorded a mortgage on the Oak Bluffs Property with respect to Note A

and recorded a mortgage on the Brookline Property with respect to Notes B and C.  In reality, however,

Eric had only recorded the Oak Bluffs Property mortgage securing Note A.

28.     On April 23, 2007, Eric executed a promissory note ("Note D") in which he promised to

repay $30,000 plus interest at a yearly rate of 7.75% on or before June 14, 2007.  Note D contained a

security clause with identical language to the security clauses in Notes B and C stating that Note D would

be secured by a mortgage covering the Brookline Property.  Eric orally promised Leilani that he would

execute and record a separate mortgage document granting Leilani an interest in the Brookline Property

to secure the debt embodied by Note D.

29.     In April 2007, Leilani loaned Eric the $30,000 identified in Note D from her personal

funds.  In making this loan, Leilani relied on Eric's representation that he intended to execute and record

a mortgage securing this debt.  Leilani also relied on the representations contained within Note D.

Additionally, Leilani continued to rely on Eric's September 2006 promise that he would pay Leilani in full

from the proceeds of the sale of the Brookline Property after he had paid off the existing debts owed to

the banks.

---

[5] Trial Tr. vol 1, 86:4-8, September 10, 2014.

30.     Eric did not execute a separate mortgage document securing Note D.  No mortgage was ever recorded on the Brookline Property securing Note D.

**Note E**

31.     In June 2007, Eric approached Leilani yet again for an additional $20,000 to finish the Brookline Property project.  On or about June 15, 2007, Eric executed a promissory note ("Note E") in which he promised to repay Leilani $20,000 plus interest at a yearly rate of 7.75%.  Note E contained the same security clause as the prior notes stating that the debt embodied by Note E would be secured by a mortgage on the Brookline Property.  Once again, Eric promised to execute and record a separate mortgage document.

32.     Leilani loaned Eric the $20,000 identified in Note E in June 2007.  In making this loan, Leilani, once again, relied on Eric's representation that he intended to execute and record a mortgage securing this debt.  Leilani also relied on the representations contained within Note E.  Additionally, Leilani continued to rely on Eric's September 2006 promise that he would pay Leilani in full from the proceeds of the sale of the Brookline Property after he had paid off the existing debts owed to the banks.

33.     Eric did not execute a separate mortgage securing Note E.  No mortgage was ever recorded on the Brookline Property securing Note E.

**Oak Bluffs Property Expenses**

34.     On June 16, 2007, Eric acknowledged that the amount he owed Leilani for his share of the Oak Bluffs Property expenses was approximately $83,000.

**Additional Funds Lent Between July and November 2007**

35.     On around June 20, 2007, Leilani lost her job.  Around this time, Eric approached Leilani for additional funds.  Leilani was reluctant to give Eric any more money and she told him that she wanted to be repaid.  Eric responded that if Leilani "didn't keep loaning him money to finish the project

that [her] repayment was at risk."[6]  Eric insisted that he needed more money to finish the project so that

he could sell the Brookline Property and pay Leilani back.

36.      During the period from July through November 2007, Leilani loaned Eric additional

funds in over twenty separate installments totaling $150,296 using money she borrowed from the

equity line on her principal residence.  Leilani considered these installment to be an "extraordinary

loan," as they required her to borrow against her home.[7]  However, by this point, she felt that her only

chance of being repaid anything was to continue helping Eric to finish the Brookline Property condos.  As

an incentive for extending these additional funds, Eric promised to pay Leilani an extra $15,000 on top

of the $150,296 when he completed sales of the Brookline Property condos.[8]

37.      In October 2007, as Leilani grew increasingly frustrated with the situation, she asked Eric

if he had recorded mortgages securing Notes B through E as he had promised.  Eric admitted that he had

not recorded the mortgages as he had promised.  After this revelation, Leilani insisted, by an e-mail

dated October 28, 2007, that Eric record a lien securing all of the unsecured debt Eric owed her.  Leilani

stated in the e-mail that they might have to wait to record the lien until after Eric completed a

refinancing of the Brookline Property that he was currently contemplating.

38.      In October and November 2007, Leilani was undergoing cancer treatments multiple

times per week.  Eric was aware of Leilani's medical condition.

---

[6] Trial Tr. vol 1, 102:20-21, September 10, 2014.

[7] Trial Tr. vol 1, 199:16-19, September 10, 2014.

[8] I note here that, on the stand, Eric did not dispute promising an extra payment as an incentive for continuing to loan him money during this period.  Eric could only call into question the amount stating, "the amount is in question. It's not that I -- I suggested that there would be money available to her, but I didn't -- I don't remember the 15 [thousand dollars]." Trial Tr. vol 5, 11:8-10, September 17, 2014.  I credit Leilani's testimony that the amount was $15,000, and accordingly, I make the above finding on that basis.

**Without Leilani's Knowledge, Eric Sells the First Brookline Condo Unit, Refinances the Brookline Property, and Uses the Proceeds from the Sale and the Refinance to Pay Off the Two Existing Mortgages**

39.     On or around November 30, 2007, Eric sold the first of three condominium units at the Brookline Property for $550,000.  Eric did not inform Leilani of the sale.

40.     On or around November 26, 2007, Eric again refinanced the Brookline Property granting a $333,000 mortgage to MERS, as nominee for Union Capital Business Trust.   Eric did not inform Leilani of this mortgage.

41.     In or around December 2007, discharges of the $618,750 first mortgage held by MERS as nominee for lender Taylor, Bean & Whitaker Mortgage Corp. and the $250,000 second mortgage held by National City Bank were executed and subsequently recorded.

**Eric Sells the Second and Third Brookline Condo Units, Repays Leilani $250,000, and Pays Off the Last Remaining Mortgage on the Brookline Property**

42.     On or around April 30, 2008, Eric sold the second of three condominium units at the Brookline Property for $369,000.  On or around June 16, 2008, Eric sold the third of three condominium units at the Brookline Property for $365,000.

43.     On or about May 5, 2008, Eric repaid Leilani $250,000, which included repayment of the $150,296 he borrowed from Leilani during the period from July 2007 to November 2007.

44.     Approximately $333,000 of the sale proceeds went to pay off the mortgage debt owed to MERS, as nominee for Union Capital Mortgage.  A discharge of this mortgage was recorded on August 25, 2008.

45.     After paying off the $333,000 mortgage and paying $250,000 to Leilani, Eric had approximately $151,000 remaining from the $734,000 in proceeds from the sale of the second and third units.

46.     Rather than forwarding the remaining $151,000 to Leilani to pay down his remaining debts, Eric used the money to pay off other unsecured lenders.

**Application of the $250,000 Payment to Leilani**

47.     Leilani applied $150,296 of the $250,000 toward repayment of the funds Eric borrowed from Leilani during the period from July 2007 to November 2007.

48.     Leilani applied $15,000 of the $250,000 toward the incentive promise Eric made to encourage Leilani to borrow against her home during the period from June through November 2007. Eric contests the application of this $15,000 portion of the repayment.  However, he has put forth no evidence challenging the appropriateness of this application.  As stated above, I have found that Eric did promise to make this $15,000 payment upon the sale of the Brookline Property condos.  Moreover, no evidence has been presented that this $15,000 portion of the repayment was earmarked by either Eric or Leilani for any other specific purpose.

49.     Leilani applied $84,704 of the $250,000 to Eric's share of the Oak Bluffs Property 9expenses.  Leilani testified that the parties agreed to apply the $84,704 toward the Oak Bluffs Property expenses.  Eric testified to the contrary.  I do not find Eric credible on this point as his own e-mails indicate his desire to use these funds to pay down the secured debt linked to the Oak Bluffs Property.  In an e-mail dated April 1, 2008, shortly before making the $250,000 payment, Eric told Leilani, "My debt to you will be paid in full, pretty soon, starting with the May [$250,000] payment, that should put me in positive equity in [the Oak Bluffs Property] and then we should discuss the solution that will get you paid off in the best way." [9]  I credit Leilani's testimony on this point.  Accordingly, I find that the parties agreed that $84,704 of the $250,000 would be applied to Eric's share of the Oak Bluffs Property expenses.

50.     Eric was aware of the above application of his $250,000 payment to Leilani.

51.     After making the $250,000 payment, as applied above, Eric continued to owe Leilani a total of at least $321,000 plus all applicable interest under the terms of the various notes.  This total

[9] Plaintiff's Exhibit 38.

15

included the following debts:  $241,000 for the principal of Note A, $30,000 for the principal of Note C,

$30,000 for the principal of Note D, and $20,000 for the principal of Note E, plus all applicable interest[10]

under the terms of those notes.[11]

### State Court Litigation

52.      In the summer of 2008, Leilani informed Eric that she wanted to be repaid in full.  The

already strained relationship broke down completely, and the parties eventually proceeded to litigation

in Massachusetts state court in 2009.

53.      In the course of conducting discovery for the state court litigation, Leilani learned for

the first time about the multiple refinancing of the Brookline Property that Eric had conducted without

her knowledge.

54.      In early 2011, discovery in the state court action was concluding.  On March 3, 2011, Eric

filed a chapter 7 petition, commencing the present bankruptcy case and staying the state court

litigation.  Accordingly, no judgment has entered in the state court action.

### IV.      Jurisdiction

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the

dischargeability of a debt.  The matter arises under the Bankruptcy Code and in a bankruptcy case and

therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing

order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core

proceeding.  28 U.S.C. § 157(b)(2)(I) (core proceedings include determinations as to the dischargeability

---

[10] As stated above, Note A contained no provision for the accrual of interest.

[11] I note here that Leilani has alleged additional amounts owed for the balance of Eric's share of the Oak Bluffs Property expenses.  While some additional amounts might have been owed, Leilani has not established that amount by sufficient evidence.  Additionally, as will be detailed below, Leilani has not satisfied her burden of demonstrating that this portion of the debt is non-dischargeable.  Accordingly, I decline to reach a calculation of the exact amount Eric may have owed Leilani for the Oak Bluffs Property expenses above the $84,704 he repaid.

of particular debts).  This court accordingly has authority to enter final judgment in the matter.  28

U.S.C. § 157(b)(1).

**V.     Discussion**

    **A.  11 U.S.C. 523(a)(2)(A)**

        **i.     Applicable Law**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false

pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).  In order to establish that a

debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove

each of the following elements by a preponderance of the evidence: "1) the debtor made a knowingly

false representation or one made in reckless disregard of the truth; 2) the debtor intended to deceive; 3)

the debtor intended to induce the creditor to rely upon the false statement; 4) the creditor actually

relied upon the misrepresentation; 5) the creditor's reliance was justifiable; and 6) the reliance upon the

false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001), citing

*Palmacci v. Umpierrez*, 121 F.3d 784, 786 (1st Cir. 1997).

The first element, making a knowingly false representation, refers to the conduct of the debtor

and can include a debtor's promise to act, "[i]f, at the time he made his promise, the debtor did not

*intend to perform*[.]"  *Palmacci*, 121 F.3d at 786-87.  The second element, intent to deceive, refers to the

Debtor's mental state and specifically requires a mental state embracing an intent to deceive,

manipulate, or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47

L.Ed.2d 668 (1976); *Palmacci*, 121 F.3d at 786-87.  Intent to deceive may be demonstrated by showing

that "a false representation has been made . . . recklessly, careless of whether it is true or false," or, in

other words, with reckless disregard for the truth.  *Palmacci*, 121 F.3d at 787 (*citations omitted*).

"Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained.

The court may infer fraudulent intent from the totality of circumstances*." Danvers Savings Bank*, 427 B.R. at 195, citing *Palmacci*, 121 F.3d at 789.  Among the circumstances from which scienter may be inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance.  *Palmacci*, 121 F.3d at 789.  Although the inquiries are distinct, in many cases the same factors show both the debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive. *Faria v. Silva (In re Silva)*, 2014 WL 217889 at *5 (Bankr. D. Mass. Jan. 21, 2014), citing *Bellas Pavers, LLC v. Stewart (In re Stewart),* MB 12–017, 2012 WL 5189048 at *8 n. 4 (B.A.P. 1st Cir. Oct. 18, 2012).

The final four elements embody the requirement that the creditor's claim must arise directly from the debtor's fraud.  *Faria*, 2014 WL 217889 at *5, citing *McCrory*, 260 F.3d at 32.  As to the creditor's reliance, the Supreme Court of the United States has held that § 523(a)(2)(A) requires only justifiable reliance—a lower standard than reasonableness.  *Field v. Mans,* 516 U.S. 59, 70 (1995).  Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made.  *Id.* at 70-72.  For purposes of determining whether reliance was justified, "the circumstances of the reliance claim must be taken into account," and "the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." *Lentz v. Spadoni (In re Spadoni*), 316 F.3d 56, 59 (1st Cir.2003).

      **ii.**     **Positions of the Parties**

          **a.**   **Leilani**

Leilani contends that Eric made a knowingly false representation when he promised Leilani in September 2006 that he would pay her back in full from the sale of the Brookline Property right after he paid back the money he owed to the banks.  Leilani further argues that Eric intended to deceive her in order to induce her to lend him funds.  As evidence of falsity of the representation and Eric's fraudulent intent, Leilani points to the totality of Eric's behavior which includes his demonstrated willingness to sign

promissory notes without reading them, his failure to record mortgages to protect Leilani's position as he had promised, his refinancing the Brookline Property twice without Leilani's knowledge, his sale of one of the condo units without Leilani's knowledge, and his ultimate failure to repay Leilani when he had the opportunity to do so.  Leilani argues that she justifiably relied on Eric's promise to pay her back from the sale proceeds when she lent the funds embodied by Notes A through E.  Moreover, Leilani argues that she incurred damage as a result of her reliance on Eric's fraudulent misrepresentation.

Leilani also contends that Eric made knowingly false misrepresentations when he promised to execute and record mortgages on the Brookline Property securing Notes B through E.  Leilani argues that these promises were false at the time Eric made them and that Eric intended to deceive Leilani in order to induce her to make the loans.  As evidence of the falsity of the representations and Eric's fraudulent intent, Leilani highlights Eric's own testimony that he did not read any of the notes.  Leilani also points to the totality of the circumstances from which Eric's fraudulent intent can be inferred.  Eric only executed one mortgage and never recorded any of the mortgages despite his promises to so.  Additionally, Eric later granted additional mortgages to lenders, without Leilani's knowledge, thus subordinating any interest Leilani hoped to have held in the Brookline Property.  Leilani further contends that she justifiably relied on these promises when she lent Eric money and incurred damages as a result.

### b.  Eric

Eric does not deny making the September 2006 representation that he would repay Leilani in full from the sale of the Brookline Property after he repaid the banks.  He argues that Leilani has not carried her burden of demonstrating (1) that the representation was false at the time it was made, (2) that Eric had fraudulent intent, and (3) that Leilani actually relied on this representation in lending the money.  Eric argues that his repayment of $250,000 demonstrates his good faith.  He further argues that he repaid Notes B through E and disputes any amount of debt attributable to the Oak Bluffs Property expenses.

19

Eric also does not contest signing Notes B through E and promising therein to grant mortgages on the Brookline Property securing the notes.  Eric admits that he only executed a mortgage securing Note C, and he admits not recording any mortgages securing Notes B through E.  Eric argues that Leilani eventually released him from the obligation to execute and/or record the mortgages.  In support of this argument, he points to Leilani's e-mail, dated October 28, 2007, in which she stated that the parties might have to wait to record a lien while Eric applies for refinancing of the Brookline Property.  Eric further contends that his promises were not false at the time he made them, arguing that he fully intended to repay Leilani all the money he borrowed.  Finally, Eric contends that the debt in question has been repaid through the $250,000 payment.

iii.    **Analysis**

I find that Eric made a knowingly false representation in September 2006 when he promised to pay Leilani back in full from the sale of the Brookline Property after he repaid the money he owed to the banks.  I also find that Eric intended to deceive Leilani when he made this fraudulent representation in order to induce her to loan him money.  The totality of the circumstances demonstrate that Eric never intended to honor the priority treatment he offered in order to induce Leilani to loan him significant funds.  Subsequent to his promise, Eric incurred additional debt from other lenders and granted mortgages on the Brookline Property without Leilani's knowledge, thereby undermining her potential recovery.  As will be discussed below, Eric made numerous false representations in the course of his dealings with Leilani that demonstrate a willingness to throw his word around without any intent to honor it as he extracted more and more money from his sister.  Finally, when presented with the opportunity to substantially repay his sister with the pledged proceeds of the Brookline Property, Eric did not do so, instead opting to pay her own only a portion of what she was owed and using the excess proceeds to pay off other debt.  Eric's breach of his promise to Leilani, by itself, would not be sufficient to infer fraudulent intent.  However, his breach coupled with his actions to covertly undermine his

sister's potential recovery from the Brookline Property, his willingness to sign promissory notes without even reading them, his failure to record mortgages to protect his sister's position despite repeatedly promising her otherwise, and the apparent ease with which he both made and disregarded his promises demonstrate a pattern of deception from which I infer that Eric knew his September 2006 promise to Leilani was untrue at the time he made it.

With respect to Note A, I find that Leilani relied on the above false representation when she lent Eric $100,000 and agreed to cover $13,000 of Eric's share of payments owed on the Citibank line of credit.  I do not find that Leilani relied on this representation when she lent the $123,000 for the down payment on the Brookline Property.  Despite the incorporation of the $123,000 into Note A, Leilani had already lent those funds in March 2006, six months before Eric's false representation.  Additionally, I do not find that Leilani relied on Eric's representation when she lent the $5,000 in a "separate transaction" referenced in Note A.  No evidence has been provided as to when this debt was incurred, and accordingly, Leilani has not met her burden of demonstrating her reliance on Eric's false representation when she lent this $5,000.  With respect to Notes B through E, I find that Leilani continued to rely on this false representation when she lent Eric these subsequent funds.  With respect to the Oak Bluffs Property expenses, Leilani has not provided sufficient evidence to demonstrate by a preponderance of the evidence  what portion of the expenses were incurred in reliance on Eric's September 2006 representation.  Accordingly, as the burden lies with Leilani on this point, I do not find that Leilani relied on Eric's false representation with respect to the Oak Bluffs Property expenses other than the $13,000 in payments on the Citibank Line of credit referenced above.

I also find that Leilani's reliance was justifiable.  The Brookline Property eventually sold for a substantial profit, and had Eric simply followed through on his promise to repay Leilani in full after the banks, she would have recovered much of what she lent.  Moreover, Leilani did not know that Eric had twice refinanced the Brookline Property, thus incurring more secured debt and undermining Leilani's

potential recovery.  Relying on her understanding of what mortgages existed on the Brookline Property,

which understating was based on the information her brother conveyed to her, Leilani justifiably

believed that there was adequate equity to repay the full amount of the debt upon the sale of the condo

units.

Finally, I find that Leilani incurred damages as a result of her reliance on Eric's false

representation in the amount of the outstanding debts as set forth below.  As noted in the findings of

fact set forth above, I reject Eric's argument that Leilani incorrectly applied the $250,000 repayment and

that Eric repaid Notes C, D, and E.

I also find that Eric made knowingly false representations when he promised to execute

mortgages on the Brookline Property securing Notes B, D, and E and when he promised to record

mortgages securing Notes B, C, D, and E.  I find that Eric intended to deceive Leilani in order to induce

her to loan him funds.  The totality of the circumstances demonstrate the falsity of Eric's

representations and his fraudulent intent.   Eric's contention that he genuinely intended to pay back

Leilani in full is undermined by his utter disregard for the promises he made in order to induce Leilani to

keep loaning him money.  He never read the notes he signed, thus demonstrating a reckless disregard

for the various promises contained therein.  Repeatedly, he made promises to execute and record

mortgages that would have protected Leilani's position, and, repeatedly, he made no attempt to fulfill

his obligations.  Of the four mortgages he promised to execute and record securing Notes B through E,

he executed one and recorded none.  Moreover, he granted subsequent mortgages on the Brookline

Property to lenders without Leilani's knowledge, thereby subordinating any interest she expected to

have in the Brookline Property.  Finally, when Eric eventually sold all three units of the Brookline

Property, he failed to convey to Leilani the full amount of proceeds to which she was entitled after he

paid off the bank mortgages.  Eric's behavior is consistent with that of a person who has no intention of

living up to his promises.  Even as he knowingly ignored his obligations to his sister, Eric continued to

make false promises in order to keep the money flowing.  I infer from the totality of Eric's behavior that

his representations that he would execute and record mortgages securing Notes B through E were false

at the time he made them.  I further find that when he made these false representations, Eric intended

to deceive Leilani and to induce her to loan him funds.

I reject Eric's argument that Leilani released him from his obligations to execute and/or record

the mortgages in question.  This argument is based on an e-mail dated October 28, 2007.  By October

2007, Eric had long since shirked his obligations to execute and record the mortgages.  Even if I were to

interpret Leilani's e-mail as a release of the obligation to record the mortgages (and I do *not* read it that

way), it would not alter my finding that Eric's representations were false *at the time he made them*.

I further find that Leilani actually and justifiably relied on these false representations for all

funds, excluding those related to the Oak Bluffs Property expenses, that she lent to Eric for the period

beginning with Note B in December 2006 and ending in October 2007 when she learned the Eric had not

recorded the mortgages.  This period does not include Note A as Eric did, in fact, execute and record a

mortgage for Note A.  This period also does not include any funds lent after October 2007 when Leilani

learned of the falsity of Eric's representations and therefore no longer relied on them or did not do so

justifiably.  Additionally, I do not find that Leilani relied on Eric's false representations with respect to

her payment of Eric's portion of the Oak Bluffs Property expenses as she has not carried her burden of

demonstrating what portion of these expenses, if any, were incurred in reliance on the false promises to

execute and record mortgages on the Brookline Property.

I also find that Leilani incurred damages as a result of this reliance in the amount of the

outstanding debts as set forth below.  As noted in the findings of fact set forth above, I reject Eric's

argument that Leilani incorrectly applied the $250,000 repayment and that Eric repaid Notes C, D, and E.

Based on the above reasons, I find that the debts owed by Eric to Leilani are excepted from

discharge under 11 U.S.C. § 523(a)(2)(A) in the amount of $193,000 plus all applicable interest under the

terms of the notes.  This total consists of $113,000 of the principal of Note A, $30,000 of the principal of Note C, $30,000 of the principal of D, $20,000 of the principal of Note E, plus all applicable interest under the terms of the respective notes.  This total does not include Note B or the funds extended during the period from July through November 2007 as those amounts have been repaid.  This total also does not include the alleged balance for Eric's share of the Oak Bluffs Property expenses, other than the $13,000 included in Note A.

**B.   11 U.S.C. § 523(a)(6)**

**i.      Applicable Law**

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The requirements of this exception are as follows: The Plaintiff must show that the Debtor injured her or her property and that the injury was both "willful" and "malicious."

"Willfulness" requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question. *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). "Malice" requires the injury to have been "wrongful," "without just cause or excuse," and "committed in conscious disregard of one's duties." *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir.1997). Malice thus has both objective and subjective elements: the injury must have been objectively wrongful or lacking in just cause or excuse; and the debtor must have inflicted the injury in "conscious disregard" of his duties, meaning that he has to have been aware that the act was wrongful or lacking in just cause or excuse. *Burke v. Neronha* (*In re Neronha*), 344 B.R. 229, 231–32 (Bankr. D. Mass. 2006).

ii.    **Positions of the Parties**

a.  **Leilani**

Leilani contends that she obtained a property interest in the Brookline Property by virtue of the security clauses in Notes B through E.  She further contends that after the sale of all three units, Eric had received at least $151,000 in sale proceeds over and above the amount needed to pay off any senior encumbrances on the property.  Leilani contends that Eric was obligated to forward this $151,000 to Leilani as she held an interest in these proceeds.  Instead of conveying the money to Leilani, Eric used these funds to pay off unsecured debts to other lenders.  Leilani argues, therefore, that Eric willfully and maliciously diverted and converted, for his own benefit, funds belonging to Leilani of at least $151,000.

b.  **Eric**

Eric does not address the issue of whether the security clauses in the various notes were sufficient to have created a property interest in either the Brookline Property, itself, or the proceeds of the sale of the Brookline Property.  He does argue that any amounts owed under the notes were repaid through his $250,000 payment in May 2008.  Under this theory, any interest Leilani held in the sale proceeds was extinguished upon satisfaction of the underlying debt.

iii.    <u>**Analysis**</u>

Notes B through E each contain security clauses that state that the debts in question "will be secured by a mortgage covering the [Brookline Property]."  Notwithstanding Eric's failure to execute separate mortgage documents for Notes B, D, and E, these security pledges created a property interest, *i.e.*, an unperfected mortgage, for Leilani in the Brookline Property securing the amounts owed under Notes B through E, albeit one that was junior in priority to recorded mortgages and would not have been enforceable against a bona fide purchaser.  This property interest in the Brookline Property securing Notes B through E would have been enforceable against Eric.  When Eric sold the Brookline Property, Leilani's unperfected interest attached to any proceeds of the sale.  Again, this interest would

have been junior to any perfected encumbrance, but it would have been enforceable against Eric.

Therefore, Leilani held an interest in any proceeds from the sale of the Brookline Property condominium

units that exceeded the amounts owed on the recorded mortgages.  As stated in the findings of fact set

forth above, after paying off all interests senior to that of Leilani, Eric retained $151,000 in sale

proceeds.

Eric argues that he paid off note Notes B through E, thus satisfying the underlying debts that

would have been secured by an interest in the $151,000.  As noted above, I have found that Eric repaid

Note B and the additional funds Leilani lent between July and November 2007.  However, I have found

that Eric did *not* repay Notes C, D, and E.  Leilani held an interest in the $151,000 to the extent it secured

these outstanding debts.  Thus Eric, held an interest in the remaining sale proceeds up to the amount of

$80,000,[12] plus all applicable interest.[13]

As stated in the findings of fact, Eric used the sale proceeds in which Leilani held an interest to

pay off unsecured debts to other lenders, thus causing an injury to Leilani.  Eric caused this injury

deliberately as he intentionally diverted these funds for his own benefit with full knowledge of his

obligation to turn them over to his sister.  Accordingly, I find that the willfulness element of § 523(a)(6)

has been met.  Additionally, both prongs of the malice element are met.  Eric's use of funds in which

Leilani held an interest for his own benefit was objectively wrongful.  It was an act that amounts to

conversion.  Additionally, Eric inflicted this wrongful financial loss in conscious disregard of his obligation

to turn these funds over to his sister.  In other words, Eric was well aware of both the injury he was

causing and the wrongfulness of his actions.  Accordingly, I find that Leilani has established all the

---

[12] $30,000 for the principal of Note C, $30,000 for the principal of Note D, and $20,000 for the principal of Note E.
[13] Applicable interest includes all interest that had accrued until the time Eric paid the sale proceeds to other creditors.  I need not determine whether the applicable interest also includes interest that accrued at a later point, as I have already found that this portion of later-accrued interest on Notes C, D, and E is nondischargable under § 523(a)(2)(A).

elements of § 523(a)(6) with respect to a portion of the debt totaling $80,000 plus all applicable interest under the terms of Notes C, D, and E.

For the reasons stated above, I find that $80,000 plus all applicable interest under the terms of Notes C, D, and E, is excepted from discharge under 11 U.S.C. §523(a)(6).  I note that this amount should *not* be added to the amount that I have already found nondischargeable under § 523(a)(2)(A).  Leilani's interest in the Brookline Property sale proceeds that forms the basis of the § 523(a)(6) count was created as a means of securing the same debt that forms the basis of § 523(a)(2)(A) count.  Accordingly, $193,000 plus all applicable interest is excepted from discharge under §523(a)(2)(A), and *of this amount*, $80,000 plus all applicable interest is also excepted form discharge under the separate basis of § 523(a)(6).

**VI.       Conclusion**

For the reasons set forth above, the Court will enter a separate judgment declaring that $193,000, plus all applicable interest thereon, is excepted from discharge under § 523(a)(2)(A) and that, of this amount, $80,000, plus all applicable interest thereon, is excepted from discharge on a separate basis under § 523(a)(6).  The judgment shall reflect that the balance of the debt owing beyond the $193,000, plus all applicable interest, is *not* excepted from discharge.

Date:  February 24, 2016

_____
Frank J. Bailey
United States Bankruptcy Judge